**In the Matter of Quentin V. MENDOZA, Appellant.**

Nos. 80–330, 80–473.

District of Columbia Court of Appeals.

Argued April 15, 1981.

Decided July 17, 1981.

Andrew L. Lipps, Public Defender Service, Washington, D.C., with whom Silas J. Wasserstrom, Public Defender Service, Washington, D.C., was on the brief for appellant.

Ina L. Strichartz, Asst. U.S. Atty., Washington, D.C., with whom Charles F. C. Ruff, U.S. Atty., and John A. Terry, Michael W. Farrell and George J. Terwilliger, III, Asst. U.S. Attys., Washington, D.C., were on the brief for appellee.

Before NEWMAN, Chief Judge, and KERN and NEBEKER, Associate Judges.

NEBEKER, Associate Judge:

Following a jury trial, appellant was found to be mentally ill and likely to injure himself or others if allowed to remain at liberty. *See* D.C.Code 1973, § 21–545(b).[1]

---

1. This statute provides, in part, "If the court or jury finds that the person is mentally ill and, because of that illness, is likely to injure himself or other persons if allowed to remain at

He was committed to St. Elizabeth's Hospital for an indeterminate period. He now appeals on two grounds. First, appellant asserts that the trial judge committed error by improperly instructing the jury that the likelihood of injury includes injury to reputation, to chance of future employment, to ability to progress in the world, "and the like." Second, appellant asserts error in the trial court's refusal to instruct the jury and the expert witness on the use and limitation of expert testimony, as was required by *Washington v. United States,* 129 U.S.App. D.C. 29, 390 F.2d 444 (1967), in the context of a criminal trial where the defense is insanity.[2]

We reverse on the first issue and decline to consider appellant's second claim.

## I

Two Secret Service Agents petitioned the Commission on Mental Health for emergency hospitalization of appellant based on threats he had made to kill President Carter. *See* D.C.Code 1973, § 21–521.[3] He was admitted to the hospital, pursuant to D.C. Code 1973, § 21–522,[4] and continued hospitalization for emergency observation was authorized six days later. The hospital superintendent then filed a petition for judi-

cial hospitalization which was granted that day. *See* D.C.Code 1973 § 21–541.[5]

At the subsequent jury trial demanded by appellant, testimony revealed that appellant, while a voluntary inpatient at the hospital, had made numerous threats on the life of the President and that of a little boy in order to obtain transfer to a different ward. A few months later, appellant ran away from the hospital and snatched a three-year-old child from a playground.

The testimony which is most significant for this appeal is that of a psychiatrist from St. Elizabeth's Hospital who confirmed that appellant had made these various threats and also that appellant had experienced episodes of violence. Furthermore, the doctor diagnosed appellant as suffering from an explosive personality characterized by frequent loss of control. The doctor testified that as a result of this mental illness, appellant was likely to injure himself or others unless detained at the hospital.

No testimony was presented by appellant.

## II

The statute under which appellant was committed requires the factfinder to predict from evidence of past conduct and from

---

liberty, the court may order his hospitalization for an indeterminate period."

2. In *Washington,* the United States Court of Appeals for the District of Columbia Circuit was concerned that psychiatric testimony would either confuse the jury or usurp their role in deciding the ultimate issue of guilt. Accordingly, the instruction given in the presence of the jury cautions the expert witness to speak in clear and nonconclusory terms and to limit his opinion testimony to matters in the range of medical expertise. *See also Smothers v. United States,* D.C.App., 403 A.2d 306 (1979).

The instruction was also required by the circuit court in the context of a *Bolton* hearing before a jury. *See United States v. Ashe,* 155 U.S.App.D.C. 457, 465, 478 F.2d 661, 669 (1973). In a *Bolton* hearing, a factfinder must decide largely from expert testimony whether one acquitted of criminal charges by reason of insanity is no longer dangerous as a result of mental illness and, thus, eligible for release. *Bolton v. Harris,* 130 U.S.App.D.C. 1, 395 F.2d 642 (1968). Now, of course, the right to jury in a *Bolton* hearing has been omitted by statute. *See* D.C.Code 1973, § 24–301(d). This statute

has been held constitutional. *Jones v. United States,* D.C.App., 432 A.2d 364, 373–374 (1981).

3. This statute permits an officer, authorized to make arrests in the District of Columbia, to make application for admission of a person to a hospital for observation and diagnosis when he has reason to believe that the person is mentally ill, and because of the illness, likely to injure himself or others.

4. This statute requires as a prerequisite for admission that a psychiatrist on duty examine the person and determine that he has symptoms of mental illness and, as a result thereof, is likely to injure himself or others unless hospitalized. Notice must then be sent within 24 hours to the spouse, parent, or legal guardian of the person admitted.

5. This petition must be accompanied by a certificate of the examining physician and a sworn statement of the petitioner that the subject is believed to be mentally ill, and because of the illness, is likely to injure himself or others.

expert testimony whether the subject is likely to injure himself or others as a result of an existing mental illness. While the word "injure" is fairly understandable in its common meaning,[6] we have approved a jury instruction which reiterates this common meaning. *In re Snowden*, D.C.App., 423 A.2d 188 (1980). The relevant portion is as follows:

> Now the phrase injure himself or others, does not necessarily mean physical danger or violence. A person is likely to injure himself or others, within the meaning of the law, if that person, by reason of being mentally ill, is likely to inadvertently place himself in a position of danger or is likely to suffer harm.
>
> A person is likely to injure himself or others, within the meaning of the law, if that person, by reason of mental illness, is likely to perform some act or acts, of fail to do some act or acts, which are likely to result in harm to himself or others, and such act or acts may be either violent or non-violent.... [*Id.* at 191.]

The actual instruction given by the court differed substantially in its definition of "injure."

> There are lots of ways that people can injure themselves or injure others. The repetition for example of conduct—may injure somebody in the sense that it injures his reputation, his chance for future employment, his chance for progress in the world and the like. Now that kind of injury is just as much to be considered as hitting somebody in the head with a brick. This does not necessarily mean physical aggressiveness, it obviously doesn't mean that and doesn't mean physical trauma to a portion of a person or some other person's being, but means more.

Immediately thereafter, appellant's counsel objected to this instruction in a manner

sufficient to preserve the issue for review on appeal.

## III

Involuntary civil commitment proceedings constitute a potential deprivation of liberty which *requires careful due process* protection. *See Jackson v. Indiana*, 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972); *In re Nelson*, D.C.App., 408 A.2d 1233 (1979); *see generally* Note, *Procedural Safeguards for the Involuntary Commitment of the Mentally Ill in the District of Columbia*, 28 Cath.U.L.Rev. 855 (1979). Particularly important is that the jury not be permitted to base its decision on a questionable legal premise which is unsupported by the evidence. *See In re Nelson, supra* at 1236; *Rouse v. Cameron*, 125 U.S.App.D.C. 366, 374, 373 F.2d 451, 459 (1967). In a civil commitment proceeding, the jury may properly examine only the nature of the alleged mental illness and appellant's past conduct in assessing the likelihood of his causing future injury. *Nelson, supra.* Any instruction which does not focus the jury's task directly on the facts adduced at trial invites consideration of irrelevant matters. *See In re Alexander*, 125 U.S.App.D.C. 352, 355, 372 F.2d 925, 928 (1967).

In this case, the court's instructional definition of "injure" invited speculation by the jury on matters which were not in evidence. *See Covington v. Harris*, 136 U.S.App.D.C. 35, 41, 419 F.2d 617, 623 (1969) (civil commitment statutes are to be narrowly construed). Thus, it is possible that the issue of potential injury was decided by improper inference that given appellant's predictable behavior he might "injure" his reputation "and the like" but not necessarily cause the kind of injury focused on by the evidence. In this statutory context, the word "injure" at least implies an

---

6. In *Cross v. Harris*, 135 U.S.App.D.C. 259, 418 F.2d 1095 (1969), the circuit court had occasion to construe the words "dangerous to other persons" contained in the Sexual Psychopath Act, D.C.Code 1967, § 22–3503(1). The court held that "dangerousness" required a finding of a high probability of substantial injury. *Id.* at 261, 418 F.2d at 1097. The court further held "that Congress intended the courts to define the unavoidably vague concept of 'dangerousness' on a case by case basis, in the traditional common law fashion." *Id.* at 263, 418 F.2d at 1099.

element of dangerousness, and the case law so indicates. *Thomas v. United States*, D.C. App., 418 A.2d 122, 125 (1980); *Rouse v. Cameron*, 128 U.S.App.D.C. 283, 285 n.7, 387 F.2d 241, 243 n.7 (1967); *In re Alexander*, supra at 354, 372 F.2d at 927.

Involuntary civil commitment is appropriate when a factfinder determines, by clear and convincing evidence, that the subject is likely to cause injury to himself or others by criminal conduct or otherwise. *See, e. g., Overholser v. Russell*, 108 U.S. App.D.C. 400, 403, 283 F.2d 195, 198 (1960). Because of this standard of proof *see Addington v. Texas*, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979), and the fact that commitment is partly based on a prediction of future conduct, a jury instruction must be sufficiently pure to protect against misleading the jury into speculation. These considerations also militate against our attempting to devise a standard jury instruction. The term "injure" is sufficiently vague and the panoply of aberrant conduct requiring civil commitment sufficiently unforeseeable that our only guidance for judges is to require them to tailor the instruction on the case by case basis, in the common law tradition. *See* note 6, *supra.*

There was ample evidence in this case from which to find appellant was likely to injure others. However, considering the doubtful validity of the instruction, the due process rights of appellant, the standard of proof, and the possibility of jury speculation, we must reverse and remand for a new hearing. Jury concern with injury to earning power and reputation was not within the proper scope of inquiry on these facts *for involuntary civil commitment of appellant. See O'Connor v. Donaldson*, 422 U.S. 563, 575, 95 S.Ct. 2486, 2493, 45 L.Ed.2d 396 (1975).

*Reversed.*